Filed 9/5/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| FOX PAINE & COMPANY, LLC, et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> TWIN CITY FIRE INSURANCE COMPANY et al., <br><br> Defendants and Respondents. | A168803 <br><br> (San Francisco County Super. Ct. No. CGC17557275) |

In 2017, eight plaintiffs sued four defendants, their former insurance broker and three excess insurers, which insurers provided $40 million in excess coverage in four layers of $10 million each. The complaint alleged eight causes of action. Three amended complaints followed, by the third of which the plaintiffs had been reduced to five, the defendants reduced to the three excess insurers, and the claims winnowed to four—breach of contract, declaratory relief, breach of the covenant of good faith and fair dealing, and aiding and abetting breaches of fiduciary duty. The three excess insurers each filed demurrers, arguing among other things that plaintiffs did not allege, and could not allege, exhaustion of the underlying policies. The trial court overruled the demurrer of the first level excess insurer, but sustained

the demurrers of the two other excess insurers without leave to amend, and entered judgments for them. Plaintiffs appeal. We affirm.

## BACKGROUND

### The General Setting

In 1996 Saul Fox and Dexter Paine formed Fox Paine & Company (FPC), a private equity management firm. Fox was chief executive officer of FPC, Paine the president. In 1998, through FPC, Fox and Paine formed two private equity funds: Fund I, for which Paine was primarily responsible, and Fox Fund II, for which Fox was primarily responsible.

By 2006, Fund I was largely wound down, and Paine wanted to form a new fund, but Fox "was not inclined to do so." So, in 2006, Fox and Paine entered into an agreement under which Paine could start a third fund (Fund III) under a license from FPC to use some of its assets and employees, and Fox would receive an "equity interest" in Fund III. This is the "Newco Agreement."

### FPC'S Insurance

In December 2006, FPC obtained a Private Equity Professional Liability Policy from Houston Casualty Company (Houston Casualty). The policy covered the period from December 30, 2006 to December 30, 2007, later extended to January 2, 2008, with policy limits of $10 million. The policy provided coverage to "Insured Organizations" as well as "Insured Persons," including any "director, officer, general partner, manager, . . . . or employee" of an Insured Organization, or the "functional equivalent" of such persons. An endorsement to the policy listed 18 entities included in the term "Insured Organization."

FPC also purchased Excess Private Equity Insurance, specifically four policies issued by three different insurers: Twin City Fire Insurance

2

Company (Twin City), St. Paul Mercury Insurance Company (St. Paul), and Liberty Mutual Insurance Company (Liberty Mutual). The excess coverage provided $40 million in four layers of coverage, each layer providing $10 million in policy limits. The first layer of excess insurance was with Twin City, the second layer with St. Paul, the third layer also with Twin City, and the top layer with Liberty Mutual. In chart form, the "tower" of insurance looked like this:

| Excess Policies | Policy Amount | Attachment Point |
|---|---|---|
| Twin City | $10 million | $10 million |
| St. Paul | $10 million | $20 million |
| Twin City | $10 million | $30 million |
| Liberty Mutual | $10 million | $40 million |
| Total Excess Policies | $40 million | |

**The Delaware Litigation**

Fox's relationship with Paine deteriorated, and the Newco Agreement "fell apart," resulting in the first of what would become a litany of litigation, when, in August 2007, Fox, individually and derivatively on behalf of FPC and two Fox-owned entities (the "Fox parties") filed suit in Delaware Chancery Court against Paine, Paine's family trust, Fox Paine Management III, LLC (FPM III), and FPC (the "Paine Parties").

In September, the Paine Parties filed counterclaims against the Fox parties.

In November, FPC's broker Equity Risk Partners (ERP) sent a notice of claim of the Paine counterclaims to all insurers, including the three excess insurers.

In December, the Delaware lawsuit was settled, in a settlement agreement that was to effect a "complete divorce" between the Fox parties and FPC and the Paine parties.

Whatever the peace envisioned, it was short-lived, as in January 2008 Paine filed a pleading involving the settlement agreement. This was the first in a series of fights that would last for the next five years, as the Fox parties and Paine parties (including several former FPC directors and officers) became embroiled in lawsuits, arbitration proceedings, writs, and an appeal stemming from the August 2007 lawsuit and its settlement (the Fox-Paine litigation).[1]

The Fox-Paine litigation ended with a settlement agreement in August 2012, which agreement represented it "resolved all outstanding issues among" Fox and Paine and "effectively put an end to the Fox-Paine Litigation."

As will be seen, there was more litigation to come.

Meanwhile, according to the third amended complaint, prior to the settlement of the Fox-Paine litigation, relying on the November 2007 notice of claim, the Paine parties sought reimbursement for costs incurred in the Fox-Paine litigation. And, plaintiffs alleged, Houston Casualty "agreed to pay" the Paine parties' costs after concluding they were covered under the policy, eventually distributing the $10 million policy limits to the Paine parties, thus exhausting the primary policy.

**The New York Litigation**

In February 2014, Fox and FPC filed suit in New York state court against Houston Casualty and ERP, FPC's now former insurance broker.

---

[1] As the Fox parties admitted in their first amended complaint, most of this litigation was filed by the Fox parties.

Plaintiffs alleged that Houston Casualty, with ERP's assistance, wrongfully distributed the entire $10 million of insurance proceeds under the Houston Casualty policy to the Paine parties. In 2017, the plaintiffs settled with Houston Casualty, but not with ERP, and the litigation against it continued.

**The San Francisco Litigation**

In February 2017, alleging they were "insureds," Fox and seven Fox-related entities (plaintiffs) filed a complaint in San Francisco County Superior Court.[2] The complaint named four defendants, the three excess insurers and ERP, and alleged eight causes of action. Each defendant filed a demurrer. But before the demurrers were heard, on June 26, plaintiffs filed a first amended complaint adding two new causes of action, now alleging 10 claims.

At that point, the proceedings in the San Francisco action were stayed to permit the New York action to proceed against ERP, a stay that lasted several years.

On November 9, 2022, plaintiffs' filed a second amended complaint, a complaint markedly different from the earlier two complaints in several respects: (1) the plaintiffs were represented by a new law firm; (2) the plaintiffs were reduced from eight to five; (3) the defendants were only the three excess insurers; and (4) the causes of action had been reduced from 10 to five, styled as breach of contract, declaratory judgment, breach of covenant

---

[2] The eight plaintiffs were: (1) Fox Paine & Company, LLC, (2) Fox Paine Capital Fund II GP, LLC, (3) Fox Paine Capital Management II, LLC, (4) Fox Paine International GC, L.P., (5) Fox Paine International GP, LTD, (6) Fox Paine International LPH, L.P., (7) Fox Paine International LPH GP, LTD, LLC and (8) Saul A. Fox.

of good faith and fair dealing, aiding and abetting breaches of fiduciary duty, and waiver and estoppel.[3]

Again, all three excess insurers filed demurrers. Plaintiffs filed opposition and also motions to strike the demurrers of Twin City and St. Paul. Defendants filed replies, and the demurrers and motion to strike came on for hearing on March 1.

On March 17, 2023, the trial court filed its order (1) denying plaintiffs' motion to strike; (2) sustaining St. Paul's and Liberty Mutual's demurrers with leave to amend; and (3) sustaining in part and overruling in part Twin City's demurrer. As pertinent here, in sustaining the demurrers of St. Paul and Liberty Mutual, the court held that plaintiffs had failed to allege exhaustion.

On April 7, plaintiffs filed their third amended complaint (TAC), now alleging four causes of action, the same claims in the second amended complaint without the waiver and estoppel claim. While making some distinctions between and among the insurers, the TAC generally alleged the same claims against the three excess insurers.

Again, all three excess insurers demurred, fundamentally arguing that plaintiffs "fail[ed] to state sufficient facts establishing that all underlying insurance ha[d] been exhausted" and therefore failed to state a claim. As to plaintiffs' declaratory relief claim, the insurers argued that it was duplicative of plaintiffs' breach of contract claim, that the TAC failed to demonstrate an "actual controversy," and that the trial court had discretion to dismiss the claim under section 1061 of the Code of Civil Procedure. As to the remaining claims, the demurrers contended that plaintiffs failed to state a claim for

---

[3] At some point, apparently in October 2021, plaintiffs had dismissed ERP from the case.

either breach of implied duty of good faith and fair dealing or aiding and abetting breaches of fiduciary duty.

On August 9, the demurrers came on for hearing, along with several other matters. And on August 10, the trial court filed a comprehensive 23-page "omnibus order" ruling on the several matters. As pertinent here, that is, the demurrers, the trial court sustained in part and overruled in part Twin City's demurrer, overruling it as to the first level of excess insurance, finding that plaintiffs "sufficiently allege" exhaustion of the primary Houston Casualty policy such that "Twin City's first excess coverage policy was triggered." The trial court rejected Twin City's other arguments in support of demurrer, and plaintiffs' claims against Twin City are proceeding below.[4]

As most pertinent here, the order sustained the demurrers of St. Paul and Liberty Insurance without leave to amend, holding that plaintiffs did not allege exhaustion of the underlying policies. The trial court also rejected plaintiffs' arguments that by virtue of settling with the Paine parties St. Paul had waived the right to rely on the exhaustion provision, or was estopped from arguing that exhaustion had not occurred.

On September 19, the trial court entered judgment for Liberty Mutual, and on September 26, judgment for St. Paul. And on October 2, plaintiffs filed notices of appeal from those judgments.

## DISCUSSION

### Introduction

Plaintiffs make four arguments on appeal: (1) the trial court erred in holding that "plaintiffs had to establish actual exhaustion"; (2) St. Paul

---

[4] Plaintiffs' brief asserts that trial against Twin City was scheduled for January 2024, Liberty Mutual's brief that it was to begin in April. At oral argument, counsel confirmed that it actually began in mid-August.

waived or is estopped from asserting lack of exhaustion as a defense; (3) there was "no reason to dismiss plaintiffs' other, unrelated tort causes of action"; and (4) the trial court abused its discretion in sustaining the demurrer without leave to amend.

**Demurrers and the Standard of Review**

We set forth the governing principles in *Chiatello v. City & County of San Francisco* (2010) 189 Cal.App.4th 472, 480: " 'Because this case comes to us on a demurrer for failure to state a cause of action, we accept as true the well pleaded allegations in plaintiffs' [third] amended complaint. " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]" ' [Citation.] We likewise accept facts that are reasonably implied or may be inferred from the complaint's express allegations.' [Citations.] ' " 'A demurrer tests the legal sufficiency of the complaint . . . .' [Citations.] On appeal from a dismissal after an order sustaining a demurrer, we review the order de novo, exercising our independent judgment about whether the complaint states a cause of action as a matter of law. [Citations.] When the trial court sustains a demurrer without leave to amend, we must also consider whether the complaint might state a cause of action if a defect could reasonably be cured by amendment. If the defect can be cured, then the judgment of dismissal must be reversed to allow the plaintiff the opportunity to do so. The plaintiff bears the burden of demonstrating a reasonable possibility to cure any defect by amendment." ' "

In 2021, we added this: "We also assume the attachments to the complaint are true, and they take precedence over any conflicting allegations

8

in the [T]AC. [Citation.] [¶] Finally we 'will affirm if there is any ground on which the demurrer can properly be sustained, whether or not the trial court relied on proper grounds or the defendant asserted a proper ground in the trial court proceedings." (*George v. eBay, Inc.* (2021) 71 Cal.App.5th 620, 628 (*George*).)

"Although we review the complaint de novo, ' "[t]he plaintiff has the burden of showing that the facts pleaded are sufficient to establish every element of the cause of action and overcoming all of the legal grounds on which the trial court sustained the demurrer, and if the defendant negates any essential element, we will affirm the order sustaining the demurrer as to the cause of action. [Citation.] . . . ." (*Kahan v. City of Richmond* (2019) 35 Cal.App.5th 721, 730 (*Kahan*).)

By way of further introduction, we note that plaintiffs first argument focuses almost entirely on their declaratory relief cause of action, paying at most lip service to their claim for breach of contract. Indeed, Liberty Mutual's brief asserts that plaintiffs "do not seriously dispute the Superior Court's holding that they have not stated a claim for breach of contract"—an assertion to which plaintiffs do not take issue in their reply. We nevertheless begin our analysis with the breach of contract claim.

**No Breach of Contract**

Plaintiffs' first cause of action is breach of contract. As plaintiffs describe it in their brief, the excess insurers "breached their obligations to Plaintiffs by, among other things: (i) failing to provide consent to defense costs arising from covered claims; (ii) failing to pay or reimburse Plaintiffs' defense costs for covered claims; (iii) refusing to communicate with Plaintiffs, their insureds . . . ; (iv) failing to properly investigate tendered claims; (v) communicating improperly with FPC's litigation opponents, and non-

9

insureds, regarding coverage and proceeds . . . ; (vi) failing to disclose communications to third parties regarding the Excess Policies; and (vii) improperly disbursing policy proceeds from the FPC Policies to uninsured parties who were litigating against the Plaintiffs . . . .  (E.g., 6AA1113–1114 [TAC ¶ 86-90]; see generally Ins. Code, § 790.03, subdivision (h).)"

We begin by noting that, except for the claim, however imprecisely expressed, that the excess insurers failed to pay covered claims, the other "failures" alleged by plaintiffs cannot be breaches of contract, as the alleged wrongs are not within the coverage of the policies.  In other words, neither policy requires that the insurer do—or not do—any of the things alleged, and thus cannot support a breach of contract.  (*Archdale v. American International Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449, 466 [breach of contract cause of action "necessarily relates only to the *express* promises made by [an insurer] in its policy"]; see also *Levy v. State Farm Mutual Auto. Ins. Co.* (2007) 150 Cal.App.4th 1, 5, 58 [demurrer properly sustained where plaintiff offered mere allegation of breach without facts demonstrating "a link" between the alleged violations "and the insurance contract[]"].)

And as to the allegation as to what might be a breach of contract, i.e., the failure to pay covered claims, it fails as well, as the policies are excess policies, described this way by the late Justice Croskey in his leading commentary:

" '**Excess' insurance:**  Excess insurance 'refers to indemnity coverage that attaches upon the exhaustion of underlying insurance coverage for a claim.'  (*Montrose Chemical Corp. of Calif. v. Superior Court (Canadian Universal Ins. Co., Inc.)* (*Montrose III*) (2020) 9 Cal.5th 215, 222 (internal quotes omitted); *Powerine Oil Co., Inc. v. Superior Court*

10

*(Central Nat'l Ins. Co. of Omaha)* (*Powerine II*) (2005) 37 Cal.4th 377 (citing text).)

"In other words, excess insurance 'provides coverage after other identified insurance is no longer on the risk.' (*North American Capacity Ins. Co. v. Claremont Liability Ins. Co.* (2009) 177 Cal.App.4th 272, 291.)

"An excess insurer's coverage obligation begins once a certain level of loss or liability is reached; that level is generally referred to as the 'attachment point' of the excess policy. [Citations.]" (Croskey, et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2023) ¶ 8:177.)

In *Reserve Insurance Co v. Pisciotta* (1982) 30 Cal.3d 800—there addressing the issue of insolvency of an underlying insurer—our Supreme Court held that "we must look to the excess policy's express language to determine whether an excess insurer is obligated" on its policy. (*Id.* at p. 814.) We do that, and easily conclude that plaintiffs show no such "obligation." The policies have not, in Justice Croskey's words, "attached."

The St. Paul policy provides that St. Paul "shall only be liable . . . after the total amount of all Underlying Limits of Liability has been paid in legal currency by the Issuers of all Underlying Insurance as covered loss thereunder."

The Liberty Mutual policy "only provides coverage when the **underlying limit of liability** is exhausted by reason of the insurers of the **underlying policies** paying or being held liable to pay in legal currency the full amount of the **underlying limit of liability as loss**." And "**underlying limit of liability**" is defined as "the combined limits of liability of the **underlying policies**, less any reduction or exhaustion of limits of liability due to payment of loss under those policies." And "**underlying policies**" are

11

defined as the Houston Casualty policy in the first, second, and third-layer excess policies issued by Twin City and St. Paul.

Those are the provisions in the excess policies, policies that, as plaintiffs concede, are "generally interpreted using the ordinary rules of contractual interpretation." We described this and other rules of policy interpretation in *Alterra Excess & Surplus Ins. Co. v. Snyder* (2015) 234 Cal.App.4th 1390, 1402: " ' "[w]hile insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." [Citations.] "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. [Citation.]" [Citation.] "Such intent is to be inferred, if possible, solely from the written provisions of the contract." [Citation.] "If contractual language is clear and explicit, it governs. (Civ. Code, § 1638.)" [Citation.] Moreover, if the policy's terms are " 'used by the parties in a technical sense or a special meaning is given to them by usage,' " this use or meaning "controls judicial interpretation." [Citation.]' (*La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 37.)"

In short, the "interpretation of an insurance policy is a question of law." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 (*Waller*).) And "[i]f contractual language is clear and explicit, it governs." (*Yahoo, Inc. v. National Union Fire Insurance Co. of Pittsburgh, PA* (2022) 14 Cal.5th 58, 67.)

The trial court order addressed the question of exhaustion as to all three of the excess insurers, in a lengthy analysis. Following that analysis,

the trial court sustained the demurrers of St. Paul and Liberty Mutual without leave to amend.[5]  This was correct.

The St. Paul policy is triggered only if the "total amount of" underlying limits "has been paid."  And Liberty Mutual's policy "only provides coverage" when the underlying limit of liability "is exhausted" by the underlying insurers "paying or being held liable to pay."  Such language demonstrates that the St. Paul and Liberty Mutual policies did not "attach"—and no obligations arose.  (See *Qualcomm, Inc. v. Certain Underwriters at Lloyd's, London* (2008) 161 Cal.App.4th 184, 189 (*Qualcomm*) [insurer's obligations did not arise "until [the underlying insurer] actually paid in the full . . . amount of its underlying limit"]; *Wells Fargo Bank v. California Ins. Guarantee Assn.* (1995) 38 Cal.App.4th 936, 945; *Span, Inc. v. Associated International Ins. Co.* (1991) 227 Cal.App.3d 463, 476.)  As the Ninth Circuit put it in applying California law, "[u]ntil the legal obligations of the primary insurers ha[ve] been determined and the excess policies had been triggered," an insured "[can]not . . . sue[] the excess insurers for breach of contract." (*Iolab Corp. v. Seaboard Sur. Co.* (9th Cir. 1994) 15 F.3d 1500, 1504 (*Iolab*).)[6]

**No Declaratory Relief Claim**

Plaintiffs' second cause of action was styled "declaratory judgment," more accurately called "declaratory relief."  As noted, it is this cause of action to which plaintiffs devote the bulk of their argument, in an argument that

[5] The court also sustained the demurrer of Twin City as to its third-layer excess policy but, as indicated, overruled it as to the first layer.

[6] The Liberty Mutual policy also requires as a condition of coverage of defense costs that the "insureds shall not . . . incur costs of defense, where the  . . . costs of defense are reasonably likely to involve the limit of liability of this [Liberty] policy, without the **Insurer's**  prior written consent, which consent shall not be unreasonably withheld."  The TAC does not allege that plaintiffs even tried to fulfill this condition precedent.

13

reads "the trial court erred in holding that plaintiffs had to establish actual exhaustion."[7] The argument relies heavily on *Ludgate Ins. Co. v. Lockheed Martin Corp.* (2000) 82 Cal.App.4th 592 (*Ludgate*), a case plaintiffs cite 10 times in their opening brief and 16 times in their reply. Plaintiffs' argument is not persuasive—and *Ludgate* is not all plaintiffs crack it up to be.

By way of brief background, the trial court discussed the law of declaratory relief in its analysis of Twin City's demurrer, beginning with this observation: "The court may sustain a demurrer on the ground that the complaint fails to allege an actual or present controversy, or that it is not 'justiciable.' The court may also sustain a demurrer without leave to amend if it determines that a judicial declaration is not 'necessary or proper at the time under all the circumstances,' " citing *DeLaura v. Beckett* (2006) 137 Cal.App.4th 542, 545 and *Wilson v. Transit Authority* (1962) 199 Cal.App.2d 716, 721. Indeed.

Code of Civil Procedure section 1060 provides in pertinent part that declaratory relief is proper as to a contract "in cases of actual controversy relating to the legal rights and duties of the respective parties." But even if such "actual controversy" is established, Code of Civil Procedure section 1061 goes on to state that a court "may refuse to exercise the power" to grant declaratory relief "in any case where its declaration or determination is not necessary or proper at the time under all the circumstances." As our Supreme Court has observed, Code of Civil Procedure sections 1060 and 1061 "must be read together" (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647), going on to hold that "when resolution of the controversy over future remedies would have little practical effect in terms of altering parties'

---

[7] Though plaintiffs' argument says what it says, the trial court did not hold that plaintiffs had to prove exhaustion.

14

behavior, courts have considerable discretion, pursuant to Code of Civil Procedure section 1061, to deny declaratory relief because it 'is not necessary or proper at the time under all the circumstances.' " (*Id*. at p. 648.)

That is the situation here. Code of Civil Procedure sections 1060 and 1061 both demonstrate that declaratory relief is not appropriate.

The TAC asked for a declaration "that plaintiffs' losses constitute covered 'loss' under the St. Paul policy," such "that St. Paul should be held liable to pay, and must actually pay, the limits of liability of its policy to plaintiffs." Plaintiffs argue this claim against St. Paul (and, for that matter, against Liberty Mutual, the fourth excess insurer), should proceed alongside the litigation now proceeding against Twin City, even if the exhaustion rule prevents their breach of contract claims from moving forward. Plaintiffs assert that an "actual justiciable controversy exists" between them and the excess insurers regarding the excess insurers' "obligations . . . to insure and reimburse plaintiffs for 'loss' incurred in connection with the [Fox-Paine litigation]."

As to the Liberty Mutual policy, the TAC seeks in part a ruling that this policy is "triggered by exhaustion of all underlying policies, who have . . . be[en] held liable to pay their limits of liability." Despite the trial court's holding that plaintiffs have not alleged exhaustion, Plaintiffs nevertheless contend they should be allowed to force Liberty Mutual to stay in the case because Paragraph 78 of the TAC alleges that "In defending themselves from and against the Delaware Litigation and Continuing Paine Claims, Plaintiffs have incurred covered 'Loss' and recoverable interest exceeding $43,000,000, not subject to offset, according to proof at time of trial. . . ." This argument fails for several reasons.

15

To begin with, as we recently confirmed in *Thomas v. Regents of University of California* (2023) 97 Cal.App.5th 587, 611 (*Thomas*), we do not assume the truth of contentions or conclusions of law. And the contentions that plaintiffs' litigation costs are "covered Loss" and not subject to offset are conclusions of law. So, too, the allegation in Paragraph 94 of the TAC that the underlying limits will be exhausted as that involves the construction of the Liberty Mutual policy.

Second, the alleged $43 million does not reach the Liberty Mutual policy because plaintiffs admit it includes interest. But Liberty Mutual does not owe interest as a matter of law, as the underlying policies have not been exhausted, and thus Liberty Mutual's performance not come due. (Civ. Code, § 3287.)

The situation presented here is exactly the same as that in *Qualcomm*, where the policy provided that the excess insurer "shall be liable only after the insurers under each of the Underlying Policies have paid or have been held liable to pay the full amount of the Underlying Limit of Liability" (*Qualcomm*, *supra*, 161 Cal.App4th at p. 189), language materially identical to the exhaustion provision in the Liberty Mutual policy. Qualcomm settled with the primary insurer for less than full policy limits. The court held that Qualcomm could not satisfy the exhaustion provision in the excess policy.

*Ludgate* is not to the contrary. There, Ludgate and other insurers filed a declaratory relief action against Lockheed. Ludgate later "separated itself from" the other plaintiffs and "pursued its claim against Lockheed on its own as a separate and independent plaintiff." (*Ludgate*, *supra*, 82 Cal.App.4th at p. 597.)

Lockheed filed a cross-complaint for declaratory relief and breach of contract. In response, Ludgate filed a motion for judgment on the pleadings,

16

asserting that the cross-complaint did not present a justiciable controversy. The trial court granted the motion. The Court of Appeal reversed, holding that Ludgate "was bound by the allegations in its own complaint, including the existence of an actual controversy between the parties. By alleging the existence of an actual controversy, the insurer waived the opportunity to deny such a controversy as to [Lockheed's] cross-complaint." (*Ludgate*, *supra*, 82 Cal.App.4th at p. 605.)

Reaching that conclusion, the Court of Appeal discussed at length, over several pages, Ludgate's own amended complaint and first amended complaint, and said that "Ludgate is bound by the allegations." Then, after more discussion, the court held as follows: "Because Ludgate alleged and represented to the court that '[a]n actual and justiciable controversy exists between [Ludgate] and Lockheed over the rights, duties and obligations of the . . . Primary Policies and the Excess Policies,' and that 'a judicial determination of the rights and duties of the parties with respect to defense and indemnity under the Primary Policies and the Excess Policies,' was necessary to resolve the actual controversy, a claim that was not disputed by Lockheed, the issue was properly joined and a sufficient cause of action for declaratory relief was stated both by Ludgate's first amended complaint and Lockheed's fifth amended cross-complaint." (*Ludgate*, at p. 605.)

After that, the court continued on for over a page discussing Code of Civil Procedure section 1060. Only after all that did the court make the comment on which plaintiffs rely where, citing nothing, the court said this: "All that Code of Civil Procedure section 1060 requires is that there be 'actual controversy relating to the legal rights and duties of the respective parties.' Exhaustion of underlying limits, while necessary to entitle the insured to recover on the excess policy, is not necessary to create actual controversy.

17

Exhaustion is merely an issue of proof and entitlement to recovery, not of pleading." (*Ludgate*, at p. 606.)[8]

That, in our view, is pure dictum.

In any event, *Ludgate* is distinguishable, as noted in *Dominguez v. Bonta* (2022) 87 Cal.App.5th 389, 419. There, plaintiffs sought declaratory (and injunctive) relief challenging the constitutionality of two statutes. The trial court sustained defendants' demurrer without leave to amend, noting among other things that the complaint "does not state nor can it state a justiciable controversy." The Court of Appeal affirmed, observing that "[n]otably, none of the authorities cited by plaintiffs stand for the proposition that an appellant may avoid a demurrer merely by alleging an unripe dispute constitutes an 'actual controversy.' (See *Ludgate* [, *supra*,] 82 Cal.App.4th [at pp.] 604–605 [each party, through their pleadings, admitted facts demonstrating an actual controversy]. . . .)"

*Ludgate* is distinguishable for another reason: the insured Lockheed pleaded facts that would establish exhaustion. (*Ludgate*, *supra*, 82 Cal.App.4th at pp. 606–608.) Lockheed's cross-complaint included exhibits demonstrating that it had less than $90 million in underlying primary limits and its indemnity claim was for "at least $140.6 million." (*Ludgate*, at pp. 606–607.) The court noted that Lockheed had "sufficiently alleged

_____

[8] Our accurate description of Ludgate reveals that plaintiffs' description is inaccurate, their brief describing *Ludgate* this way: "There, an insured sought a declaration that its excess insurer was required 'to defend and indemnify [it]' for certain environmental claims, based on the insured's allegation that its losses would reach the excess policies. ([*Ludgate*, *supra*, 82 Cal.App.4th] at p. 598.) The trial court, just like the court here, dismissed the complaint for failure to prove exhaustion. (*Id*. at p. 601.)" As is apparent from our extensive discussion, plaintiffs' description is a mischaracterization of the case.

exhaustion of underlying limits," demonstrating the existence of an "actual controversy. . . ." (*Id.* at pp. 606–607.) Additionally, Ludgate admitted that Lockheed's alleged indemnity costs were likely to reach Ludgate's coverage layer. (*Id.* at pp. 607–608.) Neither circumstance is present here.[9]

Even if plaintiffs had established the existence of an actual controversy—and they have not—the trial court had discretion to dismiss the declaratory relief cause of action if a declaration was not necessary or proper at the time under the circumstances.

It has long been the rule that a "not necessary or proper" determination can be made on demurrer. (*Moss v. Moss* (1942) 20 Cal.2d 640, 642–643 and authorities there cited.) And such a determination is a discretionary one, "subject to reversal only if that discretion is abused." (*Otay Land Co. v. Royal Indemnity Co.* (2008) 169 Cal.App.4th 556, 563.)

It is true that the trial court here did not indicate it was using its discretion to sustain the demurrers, so we cannot hold that the court's discretion was not abused. That said, our review is de novo and, as noted, we will affirm if there is any ground on which the demurrer can properly be sustained, whether or not the trial court relied on that ground. (*George, supra*, 71 Cal.App.5th at p. 628; *Kahan, supra*, 35 Cal.App.5th at pp 730–731.)

Such is the situation here and the demurrers were properly sustained, for several reasons.

---

[9] Plaintiffs' brief misrepresents this point also, asserting that the "Excess Insurers" admitted the existence of an actual controversy because the "Excess Insurers" sued the Paine parties and plaintiffs in federal court. Paragraph 60 of the TAC that the Fox parties cite in support of this assertion states that only Twin City and St. Paul filed those lawsuits, not Liberty Mutual. Indeed, Liberty Mutual was not a party to either lawsuit.

19

The first is that at least two aspects of plaintiffs' declaratory relief claim are derivative of other claims. For example, the TAC requests declaratory relief "that St. Paul's policy . . . is triggered by the exhaustion of the 'first layer' Twin City policy and plaintiffs' losses, a request obviously derivative of plaintiffs' breach of contract claim. Likewise plaintiffs' request for a declaration that St. Paul "waived" its right to rely on the exhaustion provision or is "estopped" from requiring it.

"The object of the [declaratory relief] statute is to afford a new form of relief where needed and not to furnish a litigant with a second cause of action for the determination of identical issues." (*General of America Insurance Co. v. Lilly* (1968) 258 Cal.App.2d 465, 470.) "The availability of another form of relief that is adequate will usually justify refusal to grant declaratory relief." (*Girard v. Miller* (1963) 214 Cal.App.2d 266, 277.)

An additional reason why declaratory relief is not proper is that the outcome of the litigation currently proceeding against Twin City is unknown. That litigation includes a claim for breach of contract, as to which Twin City has asserted several defenses. And if one or more of the defenses succeed, it will mean that Twin City would not have to pay its full $10 million policy limits. So, keeping the excess insurers in the case would raise the prospect of what we described as a "purely advisory opinion based on hypothetical facts or speculative future events." (*Hayward Area Planning Assn. v. Alameda County Transportation Authority* (1999) 72 Cal.App.4th 95, 102; *Younger v. Superior Court* (1978) 21 Cal.3d 102, 119–120 ["the rendering of advisory opinions falls within neither the functions not the jurisdiction of this court"].)

Moreover, there is the expense involved to the excess insurers—not to mention the superior court. If plaintiffs had their way, the excess insurers will have to engage in a trial alongside Twin City, this against parties who

20

apparently have unlimited resources and the willingness to spend them, witness the $25 million plaintiffs claim was spent in the Fox Paine litigation. And if it turns out that Twin City defeats or diminishes plaintiffs' claims, the excess insurers will have wasted significant time and resources. And, of course, so would the superior court in having to manage that case.

Finally, there are sound policy reasons why the excess insurers should stay on the sidelines without incurring these unnecessary costs. A strict exhaustion requirement brings stability and predictability to the excess insurance system, both for insurers and insureds. "[A]n excess insurer predicates the premiums it charges upon the obligations that it and the primary insurer assume . . . ." (*Hartford Accident and Indemnity Company v. Continental National Insurance Cos.* (1988 861 F.2d184, 1187.) Thus, burdening the excess insurers with prematurely litigating coverage issues before exhaustion upsets insurers' settled expectations. Again, *Iolab* is apt, where the court concluded that "requiring the excess insurer to defend against [the insured's] claim would impose on the excess insurers the unnecessary cost of litigating a claim that may never trigger excess coverage and thereby frustrate the policy adopted by the California courts." (*Iolab*, *supra*, 15 F.3d at pp. 1504–1505.)

### Plaintiffs' Waiver and Estoppel Argument Has No Merit

Plaintiffs next argue, an argument that affects only St. Paul, that St. Paul "waived or is estopped from asserting lack of exhaustion as a coverage defense." The argument is premised on the allegation that St. Paul paid benefits to the "Paine parties that would never have been owed absent exhaustion," a $3 million payment, plaintiffs allege, St. Paul asserted to be "expressly designated as an 'indemnity payment.'" And, the argument runs, "by making a payment to the Paine parties without insisting on exhaustion of

21

underlying limits, St. Paul waived or should be estopped from asserting any right to insist on exhaustion with respect to plaintiffs here."

We begin by observing that the argument is brief indeed, barely over two pages, and does not even set forth what plaintiffs claim the law to be—not for waiver, not for estoppel.

We described waiver at some length in *Antonopoulos v. Mid-Century Ins. Co.* (2021) 63 Cal.App.5th 580, 599–600: " ' " '[W]aiver is the intentional relinquishment of a known right after knowledge of the facts.' [Citations.] The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and 'doubtful cases will be decided against a waiver' [citation]." . . . The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right.' (*Waller*[, *supra*,] 11 Cal.4th [at p.] 31 . . . . Our Supreme Court has recognized that these general waiver rules apply in the context of an insurer relinquishing its right to deny coverage. ([*Ibid*.]) The *Monteleone* [*v. Allstate Ins Co.* (1996) 51 Cal.App.4th 509 court recognized the same: 'Waiver requires the insurer to intentionally relinquish its right to deny coverage. [Citation.]'."

Plaintiffs' argument is hard to comprehend. St. Paul is, as noted, an excess insurer whose duties under its policy do not arise until exhaustion of the underlying coverage. The TAC acknowledges that in 2012 the Paine parties were in litigation demanding payment from St. Paul under the policy because they were the insureds who had suffered covered "Loss." And St. Paul's decision to settle with the Paine parties was in the context of resolving that litigation. That is, while St. Paul *denied* coverage to the Paine parties, it simply decided in favor of resolution with the Paine parties over contentious litigation. The settlement does not imply that St. Paul would not "insist on

22

exhaustion" as to plaintiffs, and certainly does not demonstrate that St. Paul "inten[ded] to give up such right" as to plaintiffs. (*Utility Audit Co., Inc. v. City of Los Angeles* (2003) 112 Cal.App.4th 950, 959.) In sum and in short, there is no support—not in the TAC, not in the record as a whole—for the claim that St. Paul's settlement constituted a known relinquishment of the right to insist on exhaustion of the remainder of the Twin City policy limits.

In addition to all that, plaintiffs' theory is foreclosed by the public policy favoring settlements. (See, e.g., *Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 110.) As our Supreme Court earlier put it, " '[A] man is allowed to negotiate for the purchase of his peace without prejudice to his rights.' " (*Potter v. Pacific Coast Lumber Co. of California* (1951) 37 Cal.2d 592, 600.) So, too, an excess insurer.

Plaintiffs cite authorities recognizing that "an insurer may not 'favor the interest of one of its insureds over the interests of the other,' " citing *Schwartz v. State Farm Fire & Cas. Co.* (2001) 88 Cal.App.4th 1329, 1337–1338 (*Schwartz*). That is not the setting here. This case involves multiple insureds who were adverse to each other and for whom coverage was disputed. No authority precludes the insurer from settling with one insured where the settlement itself did not "exhaust" the policy or otherwise itself leave plaintiffs without coverage.

Finally, the trial court correctly rejected plaintiffs' argument because of the integration (or "merger") clause in the primary Houston Casualty policy. The St. Paul policy requires exhaustion of the Twin City policy before any payment is due, and the integration clause in the Houston Casualty policy, which was incorporated into the St. Paul policy, does not allow the policy's terms to be modified or waived except through written amendment, the policy stating that the terms of the policy shall not "be waived or changed except by

23

written endorsement or rider issued by the insurer to form a part of this policy."

Plaintiffs claim this language is "ambiguous." To the contrary, it is not only clear, it resembles language commonly found in insurance policies and other contracts, language routinely enforced by California courts. (See, e.g., *Haggard v. Kimberly Quality Care, Inc.* (1995) 39 Cal.App.4th 508, 521 ["In light of this express modification provision, no contract implied from oral statements or conduct could modify the termination provision of the Agreement"].) As we put it in *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 1535, "waiver" "cannot be reconciled with the integration clauses of the . . . contract" providing that the contract " 'may not be modified or amended by oral agreement, or course of conduct, but only by an agreement in writing signed by the parties.' "

Plaintiffs also argue that the integration clause does not meet the "conspicuousness" requirement for policy "exclusions." The clause is not operating as an exclusion, but rather as preventing waiver of an otherwise operative provision. And even if some conspicuousness requirement applied, the integration clause meets that requirement: the clause was at the end of the policy, where integration clauses are typically found; was separated into its own standalone paragraph; and was accompanied by the caption **"ENTIRE AGREEMENT."** The clause was conspicuous.

As to estoppel, we discussed this as well, in *California-American Water Co. v. Marina Coast Water District* (2022) 86 Cal.App.5th 1272, 1292–1293, noting among other things that estoppel " 'generally requires a showing that a party's words or acts have induced detrimental reliance by the opposing party.' (*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475–476; see *Rubin v. Los Angeles Fed. Sav. & Loan Assn.* (1984)

24

159 Cal.App.3d 292, 298 ['detrimental reliance is not a necessary element of waiver, only of estoppel']; *City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 487 [same].)"

The TAC does not allege, or even attempt to allege, that the settlement—or any statement or conduct of St. Paul—led plaintiffs to believe that St. Paul would not require exhaustion as to them, the TAC failing to allege that plaintiffs acted upon or "rel[ied] on" any such "belief." (*Supervalu, Inc. v. Wexford Underwriting Managers, Inc.* (2009) 175 Cal.App.4th 64, 77.)

**The Tort Claims Were Properly Dismissed**

Plaintiffs' third argument, an argument less than a page long, is that there was "no reason to dismiss plaintiffs' other, unrelated tort causes of action," referring to their claims for violation of the covenant of good faith and fair dealing (hereafter, bad faith) and aiding and abetting breaches of fiduciary duty. Plaintiffs are wrong. There was good reason to dismiss these causes of action, as neither stated a claim.

*Bad Faith*

Plaintiffs have, as noted above, not alleged exhaustion under the excess policies, and thus no coverage, a failure fatal to their claim for bad faith.

As our Supreme Court succinctly put it in *Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 408, citing *Waller*: "Of course, without coverage there can be no liability for bad faith . . . . [Citation.]" Or as *Waller* itself put it, citing to, and quoting from, a leading Court of Appeal case: "It is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer.

25

(*Love v. Fire Ins. Exchange* [(1990)] 221 Cal.App.3d 1136, 1151–1153 [(*Love*)].)" (*Waller*, *supra*, 11 Cal.4th at p. 36.)

Addressing claims by insureds similar to those plaintiffs make here, this is how the Court of Appeal distilled the law in *Brown v. Mid-Century Ins. Co.* (2013) 215 Cal.App.4th 841, 858: "The Browns allege that Mid-Century breached the implied covenant of good faith and fair dealing by failing to investigate their claim properly, engaging in unlawful and deceptive claims practices, and refusing to indemnify the Browns under the policy. Because the policy did not cover the Browns' claims, however, the Browns do not have a claim for breach of the implied covenant of good faith and fair dealing. (See *Kransco v. American Empire Surplus Lines Ins. Co.*[, *supra*,] 23 Cal.4th [at p.] 408 ['without coverage there can be no liability for bad faith on the part of the insurer']; *Cardio Diagnostic Imaging, Inc. v. Farmers Ins. Exchange* [(2012)] 212 Cal.App.4th [69,] 76 ['because no policy benefits were due under the policy, [the insured's] claim for breach of the implied covenant of good faith and fair dealing cannot be maintained'].)"

This is how Justice Croskey's commentary puts it: "[12:45] **No 'Bad Faith' Liability Where No Breach of Contract:** The insurer's obligations under the implied covenant do not extend beyond the purposes and objectives of the existing insurance contract: 'The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes.' [Citations.]

"In short, *if the insurer did not breach the policy, it did not breach the implied covenant.* (See *Waller*[, *supra*,] 11 Cal.4th [at p.] 36 ['the conclusion that a bad faith claim cannot be maintained unless policy benefits are due is in accord with the policy in which the duty of good faith is [firmly] rooted].')

26

[Citations.]" (Croskey, et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 12:45.)

Love held that "a bad faith claim cannot be maintained unless policy benefits are due." (*Love, supra*, 221 Cal.App.3d at p. 1153.) Or as that case put it at an earlier point, "there are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." (*Love, supra*, 221 Cal.App.3d at p. 1151.)

*Love* was relied on by both St. Paul and Liberty Mutual. The case is ignored in plaintiffs' reply.

Plaintiffs argue that "exhaustion is [not] an element plaintiffs must prove" to state a bad faith claim. But plaintiffs concede that an element of bad faith is that "all of the conditions required for defendant's performance had occurred," and one such "condition" that must have "occurred" before St. Paul had a duty to "perform" is that the underlying policy, i.e., the Twin City policy, be exhausted.

In claimed support of their argument that these claims do not require exhaustion, plaintiffs cite *Schwartz, supra*, 88 Cal.App.4th at pp. 1336–1340 and *Masco Contractors Servs. W. v. New Hampshire Ins. Co.* (N.D. Cal. 2005) WL 2005 No. C 04-4183 MJJ (*Masco*). Neither case applies here.

*Schwartz, supra*, 88 Cal.App.4th 1329, involved two competing claims for coverage. One set of claimants (the Schwartzes) successfully argued that the excess insurer had breached the duty of good faith and fair dealing by paying policy limits to the other set of claimants (the Weinsteins) when the latter exhausted primary coverage. (*Id.* at pp. 1337–1338.) But neither St. Paul nor Liberty Mutual has impaired whatever rights plaintiffs might

27

have to other policy proceeds if the plaintiffs prove that they have a covered claim and satisfy the exhaustion requirements.

*Masco*, *supra*, WL 405361 is likewise inapposite. There, the court held that the insured had stated a cause of action against its umbrella insurer because the complaint alleged that the umbrella carrier and the primary carrier had "coordinated their coverage positions to minimize policy benefits" (*id.* at \*4) to the insured, and thus had already breached the umbrella policy. Here, by contrast, the TAC does not allege material facts that would, if proven, establish that St. Paul or Liberty Mutual did anything to impair any rights the Fox parties may have under any other policy.

*Aiding and Abetting*

*Nasrawi v. Buck Consultants LLC* (2014) 231 Cal.App.4th 328, 343, the case cited by the trial court, sets forth the elements of aiding and abetting. We had occasion to apply *Nasrawi* in *George*, *supra*, 71 Cal.App.5th at p. 641, there, as here, in a setting involving a claim of breach of fiduciary duty. This is what we said:

"Citing CACI, *Nasrawi*[, *supra*,] 231 Cal.App.4th [at p.] 343 . . . sets forth the four elements of a claim for aiding and abetting, there in a claim involving an alleged breach of fiduciary duty: '(1) a third party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual knowledge of that breach of fiduciary duties; (3) substantial assistance or encouragement by defendant to the third party's breach; and (4) defendant's conduct was a substantial factor in causing harm to plaintiff. (Judicial Council of Cal., Civ. Jury Instns. (CACI) (2014) No. 3610 . . .)' Appellants' conclusory allegation the eBay was 'aware' of 'unscrupulous buyers who take unfair advantage of sellers' is manifestly insufficient. (*Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1154 [dismissing aiding and abetting claim where

28

plaintiff alleged that defendant generally knew of 'wrongful or illegal conduct' but did not plead knowledge of specific alleged fraud]; *Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 745.)

"Moreover, knowledge alone, even specific knowledge, is not enough to state a claim for aiding and abetting. California law 'necessarily' requires that for aiding and abetting liability to attach, a defendant have made ' " 'a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act.' " ' (*American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1476.) Or as the Court of Appeal put it in *Gerard v. Ross* (1988) 204 Cal.App.3d 968, 983, an alleged aider and abettor must have 'acted with the intent of facilitating the commission of that tort.' Such is lacking here."

Such intent was lacking in *George*. Such intent is lacking here.

Plaintiffs contend that Paine and former FPC executives owed fiduciary duties to FPC after they left FPC in January 2008, and that they breached this alleged continuing fiduciary duty by submitting and pursuing a claim based on the November 2007 notice of claim. To no avail.

First, this is the identical conclusory allegation we do not accept in ruling on a demurrer, as we recently held in *Thomas*, *supra*, 97 Cal.App.5th at pp. 660–661, there refusing to recognize an allegation of a fiduciary relationship as true when ruling on a demurrer. Beyond that, the allegations in the TAC contradict this conclusion by demonstrating that no such fiduciary duties were owed, the TAC alleging that plaintiffs' relationship with the Paine parties terminated in 2007. Plaintiffs cannot now argue that Paine owed, much less breached, a fiduciary to them in 2013.

But even if plaintiffs could somehow show that Paine did breach some duty owed to plaintiffs, the TAC fails to allege facts showing that St. Paul

29

"kn[ew] the [Paine parties]'s conduct constitutes a breach of duty and g[ave] substantial assistance or encouragement to [the Paine parties] to so act." (*Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1325.)  The only assistance alleged in the TAC is that St. Paul assisted by funding the Paine parties' litigation against the Fox parties.  Because the settlement with the Paine parties occurred well after the Fox Paine litigation ended, St. Paul could not have "funded" litigation against plaintiffs, as it had already concluded.  As we held in *George*, "[K]knowledge alone, even specific knowledge, is not enough to state a claim for aiding and abetting." (*George, supra*, at p. 641.)

Were that not enough, plaintiffs' allegations do not establish the other two elements required to state a claim for aiding and abetting:  providing "substantial assistance or encouragement" to the Paine parties, and causing harm to plaintiffs.

**Denying Leave to Amend Was Not an Abuse of Discretion**

Plaintiffs' last argument, a brief 14-lines, is that the trial court abused its discretion in denying leave to amend.  Plaintiffs say they asked for leave to amend in their oppositions below, and in claimed support of their argument cite two cases for the boilerplate principle that discretion is abused of "there is a reasonable possibility amendment could cure the defect": *JPMorgan Chase Bank, N.A. v. Ward* (2019) 33 Cal.App.5th 678, 684, and *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 (*Schifando*).

Asking for leave is hardly enough, as the law imposes on plaintiffs the burden of showing a reasonable possibility that the defect in the pleading can be cured by amendment. (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320; *Schifando, supra*, 31 Cal.4th at p. 1081; see also *Fuller v. First Franklin Financial Corp.* (2013) 216 Cal.App.4th 955, 962 ["It is the plaintiff's burden on appeal to show in what manner it would be

30

possible to amend a complaint to change the legal effect of the pleading; we otherwise presume the pleading has stated its allegations as favorably as possible"].  (Fn. Omitted).)

Nowhere—not below, not here—do plaintiffs set out any factual material that could be inserted in any fourth amended complaint to remedy the defects in their causes of action.  Plaintiffs have now had four chances to state a claim, having been given leave to amend when their demurrer to the second amended complaint was sustained.  There was no abuse of discretion.

## DISPOSITION

The judgments are affirmed.  St. Paul and Liberty Mutual shall recover their costs on appeal.

                                 _____

                                 Richman, J.

We concur:


_____

Stewart, P. J.


_____

Miller, J.


*Fox Paine & Company, LLC v. Twin City Fire Insurance Company* (A168803)

32

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court; |
| Trial Judge: | Honorable Andrew Y.S.Chang; |
| Attorney for Plaintiffs and Appellants, Fox Paine & Company, LLC et al.: | Reed Smith, Raymond A. Cardozo; King & Spalding, LLP, Anne M. Voigts, Matthew Noller, Kelly Perigoe; McKool Smith LLP, Michael J. Miguel |
| Attorney for Defendant and Respondent, St. Paul Mercury Insurance Company: | Maynard Nexsen LLP, Christopher C. Frost, James J. Hockel, Brandt P. Hill, Braden T. Morell |
| Attorney for Defendant and Respondent, Liberty Mutual Insurance Company: | Hangley Aronchick Segal Pudlin & Schiller, Ronald P. Schiller, Sharon F. McKee; Nicolaides Fink Thorpe Michaelides Sullivan LLP, Matthew C. Lovell |